**LIFE OF THE LAND et al., Appellants,**

v.

**Claude S. BRINEGAR, Individually and in his capacity as Secretary of the United States Department of Transportation, et al., Appellees,**

and

**Kalihi-Palama Community Council et al., Intervenors-Appellees.**

No. 73–1784.

United States Court of Appeals, Ninth Circuit.

Sept. 10, 1973.

Rehearing Denied Oct. 16, 1973.

462

Michael R. Sherwood (argued), Brook Hart (argued), William S. Hunt, of Hart, Sherwood, Leavitt, Blanchfield & Hall, Honolulu, Hawaii, for appellants.

Warren H. Higa, Dep. Atty. Gen. (argued), Honolulu, Hawaii, Peter R. Steenland (argued), Carl Strass (argued), Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark, Dept. of Justice, Washington, D. C., George Pai, Atty. Gen., Harold M. Fong, U. S. Atty., William C. McCorriston, Asst. U. S. Atty., Honolulu, Hawaii, for appellees.

George Playdon (argued), Tobias C. Tolzmann (argued), Honolulu, Hawaii, for intervenor.

Shearer, Lanctot, Thomas, Knorp, San Francisco, Cal., for National Audubon Society, Inc.; Gifford, Woody, Carter & Hays, New York City, for amicus curiae.

## OPINION

Before HAMLIN and TRASK, Circuit Judges, and BELLONI, District Judge*.

HAMLIN, Circuit Judge:

### INTRODUCTION

This environmental law case is an appeal from the Final Decision and Order of the United States District Court for the District of Hawaii, holding that appellees have complied with the provisions of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 et seq., and the Airport and Airways Development Act of 1970 (AADA), 49 U.S.C. §§ 1701 et seq., and denying appellants' prayer for a permanent injunction sought against the Secretary of Transportation and other officials in connection with the construction

* The Honorable Robert C. Belloni, United States District Judge, Portland, Oregon, sitting by designation.

of the reef runway extension (Reef Runway project) at the Honolulu, Hawaii, International Airport (HIA).

We affirm, concluding that appellees have satisfied the provisions of both NEPA and AADA.

## THE PARTIES

■ Appellants, plaintiffs below, are four environmental organizations [1] purportedly "concerned with the preservation of our natural environment," and four named individual residents of areas affected by flight patterns of aircraft arriving and departing from HIA. Appellants all claim to suffer adverse and irreparable injuries as a result of specific and allegedly illegal acts committed by appellees.[2]

Appellees, defendants below, are the Secretary of Transportation,[3] as the federal official ultimately responsible for federal involvement in the Reef Runway project; two named individual administrators of the Federal Aviation Agency said to have been contributors to the Secretary's alleged malfeasance or nonfeasance; and the director of the Hawaii Department of Transportation, as the state official ultimately responsible for prosecution of the project.

Permitted to intervene as defendants below were the Dillingham Corporation, the contractor which has been awarded the construction contract on the proposed project; two named individuals who reside in areas affected by overflights to HIA, and the Kalihi-Palama Community Council, Honolulu, representing other residents of those areas.

## THE DISTRICT COURT PROCEEDINGS

On November 8, 1972, one day before the scheduled opening of bids for construction of the Reef Runway project, this action for injunctive relief was filed by appellants in the United States District Court for the District of Hawaii. Upon said filing, the district court issued a Temporary Restraining Order.

A hearing on appellants' motion for a preliminary injunction was held from December 13, 1972, to December 22, 1972. On the latter date, the district court denied the prayer for a preliminary injunction and dissolved the Temporary Restraining Order previously entered.

On March 29, 1973, trial was held on the merits, at which time the evidence of the previous hearing was incorporated as if adduced at that time. Additional testimony was also presented.

On April 13, 1973, the district court filed its Final Order and Decision, denying appellants' prayer for a permanent injunction. The district court also denied appellants' motion for an injunction pending appeal.[4]

After filing a timely notice of appeal, appellants on April 27, 1973, sought an injunction pending appeal to this court. On June 11, 1973, after oral argument, we granted that motion. On August 7, 1973, we heard oral argument on the merits, and the case was submitted for decision.

1. The environmental groups, all non-profit organizations, are Life of the Land, Hawaii Audubon Society, Friends of the Earth, and Sierra Club. The National Audubon Society has submitted an *amicus* brief.

2. Appellees below did not question, nor did the district court consider, the propriety of appellants' standing to maintain this action. We are satisfied, however, that appellants are properly before this court. *See* United States v. SCRAP, 412 U.S. 669, at 683–690, 93 S.Ct. 2405, at 2414–2417, 37 L.Ed.2d 254 (1973). *Cf.* Sierra Club v. Morton, 405 U.S.

727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); San Francisco Tomorrow v. Romney, 472 F. 2d 1021, 1023–1024 (9 Cir. 1973).

3. At the time of this suit's initiation in the district court, John A. Volpe was the Secretary of Transportation. He has subsequently been replaced by Claude S. Brinegar.

4. In its Final Order and Decision, the district court incorporated by reference the reasoning set forth in its December 22, 1972, Decision and Order. The latter is reported at 363 F.Supp. 1171 (D.Haw.1972).

## BACKGROUND OF THE PROPOSED PROJECT

There was evidence before the district court supporting the following statement of facts.

Hawaii is approximately 2,400 miles from the continental United States. Over 99 per cent of all passengers travel to and from Hawaii by aircraft, and the Honolulu International Airport has consequently assumed the status of that state's principal gateway. Further, due to its unique location, HIA is the third largest point of entry for international arrivals in the United States. During labor disputes involving marine transport, HIA takes on special importance, as aircraft become the sole means of shipping and receiving cargo.

HIA serves not only the personal and commercial interests of Hawaii and the nation, but is also vital to the military. With the closing of adjacent Hickam Air Field, the United States Air Force engages in substantial operations at HIA. Of the over 250,000 operations (a landing or take-off) at the airport in fiscal 1971, military operations accounted for 52,221, with 113,701 commercial operations, and 89,992 for general aviation.[5]

HIA is presently operating at capacity levels during peak hours. Forecasts indicate that the number of aircraft operations will increase to 382,000 by 1975, at which time HIA is expected to reach and surpass both hourly and annual capacity levels, and to 493,000 by 1985.

Accompanying projected increases in aircraft operations at HIA has been an increasingly disturbing problem of aircraft noise pollution. This noise problem, which first appeared in substantial form with the introduction of jet aircraft around 1960, is accentuated because of the airport's location in close proximity to densely populated residential areas, and to downtown business sections. Further, the prevailing trade winds, which affect aircraft landings and take-offs, complicate the problem.

Increasing operations by jet aircraft have also enhanced the danger of a disaster in the event of a landing or take-off accident. There is evidence that jet aircraft mishaps most often occur within forty seconds after take-off, or about 1.6 miles from the end of the runway. In the case of HIA's present configuration, this would place the aircraft in the midst of the Kalihi-Palama residential neighborhood.

In 1961 or 1962, public concern encouraged investigations of potential solutions, including that of simply moving the jet aircraft seaward, away from human habitation.

In 1962, subsequent to the State Legislature's passage of a resolution reflecting official concern for HIA's noise problem, the state authorized preparation of a report on means to alleviate the problems concomitant with the introduction of jet aircraft at HIA. This early study resulted in the recommendation of the construction of a "Seaward Jet Runway," a proposal which was, however, never implemented because its unfavorable alignment with prevailing winds made it too hazardous to use.

In 1967, consultants were authorized by state officials to prepare a plan for future development of HIA. These consultants recommended the construction of a runway to be located 1,300 feet south and parallel to the existing runway. This plan was in turn submitted to a citizens' Task Force committee, appointed by the Governor of Hawaii. Committee members included responsible local, state and federal officials, and members of the general public. Beginning in February, 1967, and continuing through April, 1970, the Task Force committee met monthly on some 46 or 47 occasions to consider various aspects of the runway construction proposals. These meetings were for the most part open to the public, and publicized in the news media. Included in these discussions were considerations of possible al-

5. HIA is 32nd in small craft operations.

ternatives to, and environmental effects of, the proposed new runway.

The Task Force committee's work culminated in a June, 1968, recommendation that there be constructed what is essentially the project here at issue—a new 12,000 foot long runway on filled reefland, located 6,700 feet south of the existing runway. Such a runway would largely eliminate the spectre of a disastrous aircraft accident in a populated residential area, and would also reduce noise pollution by moving it more than a mile away.

In September, 1968, airline representatives to the Task Force committee commissioned their own study, which concluded that the proposed runway was unnecessary, and that the noise problem could be effectively alleviated with an extension of the existing runway, and the construction of a shorter runway for inter-island traffic. After review and discussion, the Task Force committee in January, 1970, concluded that the airline proposal provided insufficient benefits to justify a change from the plan of the Reef Runway concept. The final recommendation of the Task Force committee in favor of the Reef Runway was approved by the Governor of Hawaii in February, 1970.

In order to fund the project, the state applied to the Federal Aviation Agency for a matching 50–50 grant pursuant to the Airport and Airways Development Act of 1970, 49 U.S.C. § 1701 et seq. In compliance with that statute, a hearing was held on the proposed Reef Runway in Honolulu on March 22, 1971. Life of the Land and the Hawaii Audubon Society, two of the appellants herein, appeared at the hearing, urging consideration of measures to protect a rare water bird endangered by the proposed project.

The Federal Aviation Agency and the State of Hawaii are presently committed to the construction of the Reef Runway.

It is to be located in Keehi Lagoon, Manala Bay, south of the existing runway system. The project, whose estimated cost is upwards of $60 million, is scheduled to be completed in two increments by 1975.

There is nothing in the record indicating that the planners of the project believed, or had reason to believe, that the project would have an irreparably deleterious effect upon the environment. On the contrary, the possibility of various environmental side benefits, such as reduction of air and water pollution, enhancement of recreational boating facilities and improvement in area fishing, see *infra*, were all hopefully anticipated.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., became effective on January 1, 1970. The Reef Runway project is conceded by appellees to be a "major federal action significantly affecting the quality of the human environment," and is therefore subject to compliance with that statute.

NEPA, termed by one court "the broadest and perhaps most important" of recent federal environmental legislation, Calvert Cliffs' Coordinating Committee, Inc. v. United States AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1111 (1971), "essentially states that every federal agency shall consider ecological factors when dealing with activities which may have an impact on man's environment." Zabel v. Tabb, 430 F.2d 199, 211 (5 Cir. 1970). *See generally*, Calvert Cliffs', *supra*, 449 F.2d at 1111 et seq.

To insure that environmental ramifications of proposed projects are properly considered by those responsible for their implementation, section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) [6] re-

---

6. Section 102(2)(C) of NEPA provides in part:

 "Sec. 102. The Congress authorizes and directs that, to the fullest extent possible:

 (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter,

quires that an environmental impact statement (EIS) be prepared to "assess adverse environmental effects and discuss alternatives to the proposed action." Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 393, 463 F.2d 783, 786 (1971). As such, the EIS "provides a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed action with the environmental risks presented by alternative courses of action." Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 833 (1972).

■ Compliance with NEPA's requirement that an EIS be prepared required the officials involved to essentially duplicate in the form of more formalized studies the accumulated considerations of the preceding several years of investigation and planning, which we have described *supra*.[7] Preparation of the EIS commenced in December, 1970, and continued until the draft environmental statement was sent out for comments on September 23, 1971. Participating in the writing of the draft EIS were federal and state officials, and employees of the Ralph M. Parsons Company, a private consulting firm. After comments were solicited and received from numerous federal, state and local agencies, private organizations (including three of the appellants), and interested individuals, the team returned to work and prepared the final EIS for official approval and submission to the Council on Environmental Quality (CEQ).

■ The final EIS, dated January, 1972, was approved by the Federal Aviation Agency's regional director, in connection with his obligation under AADA. On January 21, 1972, the director transmitted the EIS and the comments thereon to the Federal Aviation Agency's Washington, D. C. headquarters, for the approval of the Department of Transportation's Assistant Secretary for Environment and Urban Systems.[8]

---

and (2) all agencies of the Federal Government shall—

\* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on —

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

\* \* \* \* \*"

7. NEPA does not apply retroactively, but it is applicable to continuing or on-going federal projects commenced prior to January 1, 1970. Lathan v. Volpe, 455 F.2d 1111, 1116, 1121 (9 Cir. 1971). The cases are collected in Citizens Organized to Defend the Environment, Inc. v. Volpe, 353 F.Supp. 520, 538 (S.D.Ohio 1972) and Sierra Club v. Froehlke, 359 F.Supp. 1289, 1322 (S.D.Tex. 1973).

NEPA does not contemplate that the decision to proceed with the project be first made by the officials involved, subsequent to which the EIS is prepared as a mere technicality in fulfillment of the statute. Here, however, the federal and state officials involved had contemplated and acquiesced in proceeding with the Reef Runway project before NEPA's passage. The fact the EIS was here prepared after a decision to proceed with the runway project had been made is attributable to the timing of NEPA's effectiveness. We reject the implication made by appellants' counsel at oral argument that the appellees have undermined the thrust of the statute. To the contrary, there is ample evidence in the record indicating that appellees have acted in a good faith attempt to comply with both the spirit and letter of NEPA. *See* City of New York v. United States, 344 F.Supp. 929, 938 (E.D.N.Y. 1972).

8. As reasonably interpreted, NEPA does not require the Secretary of Transportation to *personally* review and approve every EIS submitted to Washington. *Cf.* United States

The Assistant Secretary approved the EIS on February 29, 1972, and transmitted it to the CEQ on March 1, 1972.

The EIS totals 46 pages, plus appendages. It sets forth four purposes for construction of the Reef Runway project: (1) Reduction of the level of aircraft noise over metropolitan Honolulu, and the Kalihi-Palama area, adjacent to HIA, in particular; (2) improvement in safety by moving operations seaward and away from populated areas in the event of aircraft accidents; (3) increasing airfield capacity to provide for efficient handling of the increasing traffic; and (4) providing an alternative runway during periods when the existing principal runway is under repair.

The major thrust of this appeal is appellants' contention that the preparation, contents and distribution of the EIS failed to comply with NEPA requirements. We will examine the specifics of the EIS in our discussion and disposition of this contention.

### Delegation of the EIS' Preparation

Appellants first assert that the preparation of the instant EIS was improperly delegated to a private consulting firm which had a major and direct contingent financial interest in the Reef Runway's construction.

In June, 1968, the state appellees entered into a contract with Ralph M. Parsons Company (Parsons), a private consulting firm, whereby Parsons agreed to render management consultant services for the engineering, design and construction of the Reef Runway project. According to the contract terms, Parsons was to receive a "Guaranteed Maximum Compensation" which consisted of "15.5% of the Estimated Total Project Cost." The contract defined "project" as "construction, ready for operation by state," of five components, one of which was the Reef Runway.

■■ It does appear from the record that Parsons had a financial interest in

an affirmative decision on the proposed project. We find nothing, however, in either the wording of NEPA or the case law, which indicates that, as a matter of law, a firm with a financial interest in the project may not assist with the drafting of the EIS. As the Eighth Circuit has indicated, compliance with section 102 of NEPA is based upon good faith objectivity rather than subjective impartiality. Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289, 296 (8 Cir. 1972), aff'g, 342 F.Supp. 1211 (D. Ark.1972). See also Sierra Club v. Froehlke, 359 F.Supp. 1289, 1342 (S.D. Tex.1973).

Appellees concede that under NEPA, the applicable federal agency must bear the responsibility for the ultimate work product designed to satisfy the requirement of section 102(2)(C). We find no departure from this requirement here. The record indicates that Federal Aviation Agency officials actively participated in all phases of the EIS preparation process. The chief of the Airport Division of the Federal Aviation Agency's Pacific Region testified that he assisted with the preparation from its early stages onward. He stated that, as part of the preparation, regular meetings with other federal officials, State of Hawaii officials, as well as the Parsons representatives, were held. Further, an employee of Parsons testified as to the active involvement of the Federal Aviation Agency in the EIS preparation process. The Parsons employee concluded that the EIS "was more or less a joint effort by Parsons, the State and the F.A.A."

The record further reveals that federal officials in Washington, upon receipt of the EIS, continued active examination thereof.

We agree with the district court's conclusion that "the evidence shows that F. A.A. officials did in fact work together with state officials and a private contractor and gave it close attention."

v. King, 478 F.2d 494 (9 Cir. 1973) (delegation of authority to authorize interception

of oral and wire communications pursuant to 18 U.S.C. § 2516).

468

The case law dealing with the delegation of EIS preparation has heretofore been limited to federal agency delegation to a state agency, and has permitted such delegation where the federal agency significantly participated in the preparation of the EIS. *See* Citizens for Mass Transit Against Freeways v. Brinegar, 357 F.Supp. 1269 (D.Ariz.1973); National Forest Preservation Group v. Volpe, 352 F.Supp. 123 (D.Mont.1972). Unlike Greene County Planning Board v. F. P. C., 455 F.2d 412, 420 (2 Cir.) cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L. Ed.2d 90 (1972) and Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 362 F.Supp. 627, at 630 (D.Vt. July 27, 1973), the federal agency here involved did not "abdicate a significant part of its responsibility" to another organization.

While Parsons may have assisted in the EIS' preparation, the significant and active participation by the F.A.A. therein precludes us from concluding that there was any improper or illegal delegation in this case.[9]

*Publication and Dissemination of the EIS*

■ Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), provides in part:

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and *shall accompany* the proposal through the existing agency review processes; (emphasis added)

It is uncontested that the comments to the draft statement were not attached to the final EIS and further, that the F.A.A. failed to include within the EIS the text of all references used in the statement's preparation. Appellants urge that these omissions render the EIS legally insufficient. We disagree.

*The federal agency comments*: These comments to the draft statement were compiled as a separate document. The comments did, however, follow the proposal through the agency review process, as required by NEPA. *See* Monroe County Conservation Society, Inc. v. Volpe, 472 F.2d 693, 698 (2 Cir. 1972). The record indicates that the comments were submitted to the Assistant Secretary of Transportation for Environmental and Urban Systems. The comments were subsequently forwarded to the Council on Environmental Quality and the National Technical Information Service, where they became a part of the public record. In *Monroe County, supra,* relied upon by appellants, the court noted that "there is no indication that [the comments] accompanied the statement through the review process." 472 F.2d at 698.

*References to the EIS*: Appellants also assign error to the fact that the F. A.A. failed to include within the EIS the text of all 22 references used in the statement's preparation.

The record indicates that these references consisted of approximately 2,000 pages of technical material. They were kept on file and made available at the F.A.A.'s regional office in Honolulu. The appellants had ready access to these documents, and did in fact avail themselves of them. The references were also available for forwarding to Washington upon request.

Appellants' insistence that the federal agency comments and technical references *physically* accompany the EIS is an attempt to place form over substance. We have previously rejected such tactics

9. Lathan v. Volpe, *supra,* 455 F.2d at 1122, 1126, relied upon by appellants, is not apposite. There, no EIS had been prepared.

in the NEPA context. *See* Jicarrilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1283–1285 (9 Cir. 1973). As one court has indicated, "[NEPA] must . be construed in the light of reason." N.R.D.C. v. Morton, *supra*, 458 F.2d at 837.

There was no error in either the publication or dissemination of the EIS in this case.

### Substantive Content of the EIS

Appellants further contend that the EIS is substantively inadequate, and have submitted voluminous briefs in support of their argument. Appellants' substantive attack on the EIS encompasses assertions that the statement fails to discuss the proposed runway's environmental consequences of increased population and air pollution, fails to discuss "non-construction" alternatives to the project, and inadequately discusses those alternatives which are considered. Further, appellants assert that the EIS discussion of the runway's environmental effects upon noise pollution, water quality, recreation and wildlife is inadequate.

■ *Standard of Review*: Agency action under NEPA is subject to judicial review pursuant to § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See* Environmental Defense Fund v. Corps of Engineers, *supra*, 470 F.2d at 298–299, n.14; Town of Groton v. Laird, 353 F.Supp. 344, 348 (D.Conn. 1972). As such, a reviewing court may set aside agency action which is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *See* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413, 91 S. Ct. 814, 822, 28 L.Ed.2d 136 (1971). *See also* Scenic Hudson Preservation Conference v. F. P. C., 453 F.2d 463, 467 (2 Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972). *Cf.* Save Our Ten Acres v. Kreger, 472 F.2d 463, 465–466 (5 Cir. 1973). As we recently stated in Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1281 (9 Cir. 1973):

"Reversal of a substantive decision is appropriate only to situations where 'the actual costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental valves.'" (citation omitted) *See also*, Environmental Defense Fund v. Froehlke, 473 F.2d 346, 352–353 (8 Cir. 1972); N.R.D.C., Inc. v. Morton, *supra*, 458 F.2d at 838.

■ We examine appellants' substantive challenges, therefore, mindful of the circumscribed nature of our review.

*Demographic Effects*: Appellants argue that the EIS is inadequate in that it fails to include a study of the effect of the Reef Runway project upon the population of Honolulu and Hawaii. Appellants contend that a major incentive behind construction of the Reef Runway is Hawaii's need to accommodate and encourage increased tourism to the state. Appellants then posit that the effect of increased tourism will be to increase the *permanent* population of Honolulu, to the detriment of the local "quality of life." Hence, they argue that the EIS must contain an analysis of the demographic effects of the project.

We reject this reasoning. That an increase in Honolulu's tourism will result in an increase in that city's permanent population is speculative. Certainly, there is no empirical data in the record supportive of the allegation. We agree with the district court's conclusion that "requiring the kinds of demographic discussion suggested by [appellants] is unreasonable in the context of this project."

Hanly v. Mitchell, 460 F.2d 640 (2 Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) and Lathan v. Volpe, 350 F.Supp. 262 (W.D.Wash. 1972) where EIS discussions of demographic ramifications of the projects in issue were held to be warranted, are factually distinguishable. *Hanly* involved the proposed construction of a prison detention facility in New York City, while *Lathan* involved the proposed construc-

tion of a highway through a populated Seattle area. In both cases, the proposed project could reasonably be projected to have an effect upon local population patterns to a degree not evidenced here.[10]

 *Air Pollution*: It is agreed by all parties that no studies were made of the effect of the Reef Runway project upon air pollution. The failure to conduct such a study, however, was not an inadvertent omission. Rather, a threshold decision was made by federal and state officials that air pollution studies were unnecessary in this specific case because of the very nature and location of the proposed project.

The Reef Runway will relocate aircraft take-offs, the major source of aircraft air pollution, 6,700 feet seaward, and away from the populated areas of Honolulu. The essence of this project, therefore, involves moving the sources of the air pollution away from people. The federal and state officials concluded that detailed air pollution studies were unnecessary, on the premise that at the very least, the project was extremely unlikely to worsen the air quality in any relevant sense.

Further, appellants do not claim that the project will deteriorate the existing air quality; rather, they urge that a de-

tailed study may conceivably reveal that anticipated environmental improvement may be less than expected.

The district court acknowledged that the EIS may well have set forth in more detail the reasoning leading to the conclusion that there were no significant air pollution problems inherent in the project. But, on the record as a whole, we are unable to conclude that the district court erred in rejecting appellants' air pollution arguments.

 *Alternatives*: Section 102(2) (C) (iii) of NEPA, 42 U.S.C. § 4332(2) (C) (iii), requires that the EIS include a discussion of "alternatives to the proposed action." *See* CEQ Guideline, § 62 (iv), 36 Fed.Reg. 7725 (1971). Appellants contend that the EIS here "fails completely to discuss some reasonable and feasible alternatives to the proposed action," and "treats other alternatives in insufficient detail."

The EIS contains a brief discussion of four alternatives to the proposed construction of the Reef Runway extension. Three involve various runway concepts and configurations, and the fourth, the alternative of taking no action.

In support of their allegation that the alternatives which were considered were insufficiently treated, appellants introduced at trial testimony calculated to discredit certain data considered in re-

---

10. In Hanly v. Mitchell, *supra*, the court noted, 460 F.2d at 642:

"Plaintiffs are all members of the Chatham Square Civic Community for a Planned Community, a non-profit group concerned with the development and protection of that portion of lower Manhattan called the Civic Center. Although the area contains many government buildings, including several courthouses, surprisingly at least 50,000 people live there and in adjacent Chinatown. Included in that group are over 3,000 persons living in approximately 660 cooperative apartment buildings called Chatham Towers and Chatham Green. These directly face the proposed new jail, some 100–150 feet away."

In Lathan v. Volpe, *supra*, the proposed highway was described as follows, 350 F. Supp. at 263:

"The proposed segment involved herein would create a ten-lane highway along the

alignment of an existing four-lane highway. It would cross Lake Washington from the east on a floating bridge, enter Seattle by a tunnel through the Mount Baker district, emerge and continue through a heavily populated area, and join I–5, a north-south interstate highway." See also Lathan v. Volpe, *supra*, 455 F.2d at 1114, where we noted that this highway ran "through a densely populated, low income, city area; * * *."

Similarly distinguishable is Sierra Club v. Froehlke, *supra*, 359 F.Supp. 1289, where the court observed that "there is reason to believe that there will be development, growth and industrial expansion as a result" of the project there in issue. As we note in the text, appellants' contention that the Reef Runway project will result in expansion of the permanent population of Honolulu is mere speculation, unsupported by the record.

jecting only one alternative—that of extending the existing runway back into adjoining Hickam Air Field.[11] The planners, in addition to concluding that this alternative would create more noise than it would alleviate, noted that the replacement cost to the military would be $37 million. At trial, appellants introduced evidence indicating that this figure was inflated. No other evidence on the subject of alleged insufficiently treated alternatives was offered. There is, for instance, no allegation that an important consideration in connection with a given alternative was ignored. We find no error in the EIS' discussion of alternatives.

In addition to challenging the disposition in the EIS of alternatives which were in fact considered, appellants further contend that there exist alternatives not considered which could well accomplish the objectives of the Reef Runway project. These alleged alternatives are identified by appellants as "non-construction alternatives," which they defined as "those arrangements for managing airports as to questions like noise and capacity and air pollution which do not involve the building of new structures."

For instance, appellants suggest removal of the Air Force's KC–135 jet tankers, the loudest of the aircraft operating from HIA, to an adjacent airfield. There is, however, evidence indicating that the Air Force had refused to move its jet tankers to another base, effectively eliminating implementation of this alternative. Further, removal of the jet tankers would obviously do little to alleviate the significant noise pollution and safety problems attributable to commercial aviation.

Another alternative urged by appellants is the imposition of higher landing fees at HIA, in the hope of reducing commercial aircraft traffic. This alternative was considered early in the planning process, but rejected as ineffectual inasmuch as attempts at other airports to reduce traffic by such means have proven unsuccessful.

Appellants further suggest that private aircraft be transferred to another airfield. Again, however, such a transfer would have no effect upon the noise and safety problems presented by larger aircraft. It further appears that a ban on general aviation would violate legal agreements entered into by HIA, guaranteeing the airport's accessibility to all users.

Appellants also urge that the inter-island aircraft operating out of HIA could be required to commence their take-offs at a different point on the present runway configuration, thereby eliminating the noise problem. The record, however, indicates that only a minor percentage of the aircraft operating at HIA would be affected by this alternative, and it would therefore have only a token effect on the over-all situation.

Finally, there is nothing in the record to indicate that alternatives such as the readoption of airline schedules, imposition of curfew restrictions,[12] or conversion to wide-body aircraft design are either reasonable or feasible alternatives in this case.[13]

---

11. The other construction alternatives considered were construction of the "Seaward Jet Runway," and construction of a close-in parallel runway. Both were rejected because of inability to alleviate the noise and safety problems.

The alternative of taking no action was rejected because, without the proposed project, high noise levels would continue unhampered, and the problems of safety would remain unsolved. Further, the failure to provide for the expected growth in airport traffic would result in increasing delays.

12. At any rate, the state is apparently without constitutional authority to impose aircraft curfew restrictions. City of Burbank v. Lockheed Air Terminal, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973).

13. We reject appellants' implication that various techniques utilized at airports in the continental United States are necessarily adaptable to the unique situation existing at HIA.

NEPA's "alternatives" discussion is subject to a construction of reasonableness. N.R.D.C., Inc. v. Morton, *supra*, 458 F.2d at 834. Certainly, the statute should not be employed as a crutch for chronic faultfinding. Accordingly, there is no need for an EIS to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative. *Id.* at 834. Rather, the EIS need only set forth those alternatives "sufficient to permit a reasoned choice." *Id.* at 836. This has been done. *See also* Committee for Nuclear Responsibility, Inc. v. Seaborg, *supra*, 463 F.2d at 787; Pennsylvania Environmental Council v. Bartlett, 315 F.Supp. 238, 250 (M.D.Pa.1970).

Appellants also challenge the adequacy of the EIS' discussion of the Reef Runway's impact upon the human and natural environment. They challenge statements as unsupportable, contradictory and factually erroneous. We examine these contentions, again mindful of the limited scope of our review, *supra*.

*Noise Pollution*: Appellants do not assert that the project will have an adverse effect upon the environment by increasing noise pollution. Indeed, a prime reason for the Reef Runway project is to reduce the level of jet noise in the areas adjacent to HIA.

The EIS does discuss and graph the noise situation in some detail. There is substantial evidence in the record, including testimony by responsible federal officials, supporting the EIS' conclusion that the project will result in significant reduction of noise pollution.

Appellants' prime objection to the EIS' treatment of noise pollution is the omission therein of "on-site" noise measurement techniques. In lieu thereof, the F.A.A. utilized another well-recognized scientific technique, which rendered "on-site" measurements unnecessary. The record indicates that "on-site" measurements of independent organizations were in fact considered by the planners.

Undoubtedly, there exists a plethora of scientific studies which could have been, but were not, used to measure the noise pollution levels in the area involved. We cannot, however, conclude that the district court made a "clear error in judgment," *Citizens to Preserve Overton Park, supra*, 401 U.S. at 416, 91 S.Ct. at 823, in concluding that "(t)he kinds of studies suggested by [appellants] may be useful but are hardly necessary."

*Water Quality*: The EIS, utilizing four scientific studies undertaken for the project, concluded that the project would result in an improvement of the water quality in the marine area adjacent to the Reef Runway.

At trial, appellants presented scientific studies and various letters from university professors purportedly contradicting the EIS' water quality conclusions.

One scientist testified that one of the studies referred to in the EIS, a report of a hydraulic study prepared under the auspices of the University of Hawaii, might be read as indicating a different conclusion from that given in the EIS. The record indicates, however, that this study was based upon a proposed configuration of the project which was subsequently changed. An analysis of the project based upon this new configuration was supportive of the hydraulic study.

Appellant also introduced letters at trial after testimony was terminated, which questioned certain data and conclusions relied upon in the preparation of the EIS' water quality analysis. Apart from the obvious observation that the letter writers were, for the most part, not available for cross-examination, we note that disagreement among experts will not serve to invalidate an EIS. Indeed, "(f)urther studies, evaluation and analyses by experts are almost certain to reveal inadequacies or deficiencies." Environmental Defense Fund v. Corps of Engineers, 342 F.Supp. 1211, 1217 (E.D.Ark.1971), aff'd, 470 F.2d 289 (8 Cir. 1972). The

purpose of the EIS is to inform the decision makers of the environmental ramifications of the proposed action. *See* Committee for Nuclear Responsibility v. Seaborg, *supra,* 463 F.2d at 787. The statement need not achieve scientific unanimity on the desirability of proceeding with the proposed action.

*Recreation*: The EIS anticipates an enhancement of recreational boating facilities and an improvement in fishing conditions as a result of improvement in the water quality of Keehi Lagoon, *supra,* and the construction of channels to the open sea.

Appellants contend, however, that construction of the Reef Runway will result in "loss of surfing sites" and "loss of the effective use of the proposed Sand Island Park due to high aircraft noise."

In support of the first allegation, appellants introduced at trial the testimony of the founder of a local surfing club, who was described as an "out-reach" worker with disadvantaged youths. The witness testified that the youths feared the project might result in adverse surfing conditions. This was the sole evidence produced at trial supportive of the "loss of surfing site" arguments. The district court was understandably unpersuaded by this hearsay testimony.

The contention that use of a proposed nearby park will be adversely affected as a result of noise from aircraft utilizing the Reef Runway was adequately considered in the EIS.

On the record as a whole, we are unable to upset the district court's conclusion that the EIS adequately deals with the recreational aspects of the Reef Runway project.

 *Wildlife*: The EIS acknowledges that the proposed project will have an adverse environmental effect upon certain wildlife. This is the only clearly documented adverse environmental effect of the project which could be said to be significant. The statement notes that the Reef Runway project will displace some 186 acres of silted coral mudflats used for feeding and roosting by birds, including the rare Hawaiian Stilt. Up to 100 of these endangered birds may be affected. Appellants' concern for the Hawaiian Stilt is the basis of their attack upon this aspect of the EIS.

The record indicates that the plight of the Stilts has continuously been a matter of concern to the planners of the project. As recommended by appellants, the replacement habitats at nearby Pearl Harbor Naval Station are being developed in conjunction with the project. Also included in the project itself is the construction of certain ponds and islets suitable for the birds at a cost in excess of $350,000. *Cf*. Sierra Club v. Froehlke, *supra,* 359 F.Supp. 1289.

The main contention of appellants here is that the size of the replacement habitats may prove to be inadequate. But the district court noted, and we concur, that if the size of the habitats do indeed prove to be inadequate, there is no reason why adjustments could not be made even if the construction as planned proceeds to completion.

The record indicates that the project's planners were concerned with, and took adequate steps to minimize, the harm presented to the birds. The discussion in the EIS of the project's environmental ramifications upon wildlife was adequate.

 It is our conclusion that the EIS here in issue adequately complies with NEPA requirements.[14]

14. Appellants, noting that the EIS must stand or fall on its own merits, also contend that the district court impermissibly permitted the Federal Aviation Agency to "bolster" the document with "extrinsic evidence."

The record indicates otherwise. The "extrinsic evidence" was testimony showing why certain matters were not contained in the EIS, and was presented after appellants had challenged such deficiencies. The testimony was by "the administrative officials who participated in the decision * * * explaining their action." Citizens to Preserve Overton Park v. Volpe, *supra,* 401 U.S. at 420, 91 S.Ct. at 825. There was no error.

### AIRPORT AND AIRWAYS DEVELOPMENT ACT OF 1970

■ In addition to their NEPA contentions, appellants assert that appellees have failed to comply with the requirements of section 16(c)(4) of the Airport and Airways Development Act of 1970, 49 U.S.C. § 1716(c)(4). We find this contention equally without merit.

Section 16(c)(4) of AADA requires, in pertinent part, that the Secretary of Transportation

shall authorize no [airport extension] project found to have adverse environmental effect unless (he) shall render a finding, in writing, following a full and complete review, which shall be a matter of public record, that no feasible and prudent alternative exists and that all possible steps have been taken to minimize such adverse effect.

The record indicates that the required finding was made as a product of lengthy review by federal officials. The finding is supported by the EIS which, one court has held, may itself be considered as a section 16(c)(4) finding. Citizens Airport Commission of Chesterfield County v. Volpe, 351 F.Supp. 52, 59 (E.D.Va.1972).

There are virtually no cases indicating the standard of review a court must employ when analyzing compliance with section 16(c)(4). In Citizens to Preserve Overton Park v. Volpe, *supra*, however, the Supreme Court construed section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f), which contains virtually the identical relevant language of AADA.[15] The Supreme Court there stated that "the reviewing court must be able to find that the Secretary could have *reasonably believed* that in this case there are no feasible alternatives or that alter-

natives do involve unique problems." 401 U.S. at 416, 91 S.Ct. at 823 (emphasis added). The Court further noted that pursuant to section 706(2)(A) of the Administrative Procedure Act, the Secretary's action must not have been arbitrary or capricious. *Id.*

Incorporating the discussion of the adequacy of the EIS in our analysis of appellees' compliance with NEPA, we conclude that under the applicable standards of review, appellees have complied with AADA.

### CONCLUSION

For the reasons stated herein, the injunction pending appeal is hereby dissolved, effective immediately, and the judgment of the district court is

Affirmed.

---

15. Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f), mandates that the Secretary of Transportation disapprove any project which requires the use of parklands unless "(1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to

such park, recreational area [etc.] * * *."

The relevant language in section 16(c)(4) of AADA reads "no feasible and prudent alternative exists," and "all possible steps have been taken to minimize" harm to the environment.