**WARM SPRINGS DAM TASK FORCE, an unincorporated association, et al., Plaintiffs,**

**v.**

**Lieutenant General William C. GRIBBLE, Jr., Chief of Engineers, Corps of Engineers of the United States Army, et al., Defendants.**

**No. C–74–0649–SW.**

United States District Court, N. D. California.

June 1, 1974.

---

Robert L. Henn, Angell, Adams & Holmes, San Francisco, Cal., Paul D. Kayfetz, Bolinas, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty., Rodney H. Hamblin, Asst. U. S. Atty., San Francisco, Cal., for defendants.

James P. Botz, County Counsel, Thomas B. Sawyer, Prentice A. Fish, Deputy County Counsels, County of Sonoma, Santa Rosa, Cal., for intervenors.

## MEMORANDUM

SPENCER WILLIAMS, District Judge.

Plaintiffs seek a preliminary injunction to delay the award of a contract for the construction of a major segment of the proposed Warm Springs Dam and Lake Sonoma Project (Project) until such time as alleged deficiencies in the environmental impact statement (EIS) can be remedied.

The Project consists of a dam across Dry Creek, a major tributary of the Russian River in Sonoma County, California, a reservoir, a spillway, outlet facilities, recreation facilities, a fish hatchery, and channel improvements on Dry Creek downstream of the dam. The Project also includes 17,658 acres of land, 24 miles of relocated roads, several miles of relocated utilities, various public use facilities, such as campgrounds and picnic areas and a wildlife management area. The general location of the Project is in the Russian River Basin approximately fifty (50) miles northwesterly of San Francisco. It was authorized by the Flood Control Act of 1962, Public Law 87–874 approved 23 October 1962 by the 87th Congress, 2d Session. The project then authorized was smaller than the one now planned. Project design, land acquisition and road relocations were the major activities from that date to January 1, 1970 when the National Environmental Protection Act became law. In June 1973 the Draft Environmental Impact Statement was completed and distributed. On August 30 and September 5, 1973 public hearings were held and on December 4, 1973, the Final Environmental Impact Statement was filed with the Council on Environmental Quality.[1] Additional copies were distributed to various interested persons with the invitation to file comments with the Council within thirty (30) days. On February 14, 1974, the Council on Environmental Quality made its comments on the report. On February 15, 1974 the Corps called for bids and bids have been received, the low being in excess of 13 million dollars. On March 22, 1974 the complaint and motion for a preliminary injunction were filed and a temporary restraining order and order to show cause issued. The hearing on the matter was set for March 29th, but continued by stipulation to April 22. The temporary restraining order was continued by stipulation to May 27th. On April 2, 1974, the Secre-

---

1. The Final EIS is in two Volumes: Volume I contains 141 pages describing in some detail: Project Description, Environmental Setting Without the Project, Environmental Impact of the Project, Unavoidable Adverse Effects of the Project, Alternatives to Proposed Action, Relationship Between Short-Term Use and Long-Term Productivity, Irreversible Commitments of Resources and Coordination with Other Agencies. Volume I also contains fifteen (15) plates covering the general project area, dam site area, construction plans, schematics, and five (5) Appendices containing 115 pages of material. Volume II contains comments of Agencies, Groups, and Individuals (215 pages), the transcripts of the two public hearings, plus additional comments from various groups and individuals.

tary of Interior determined that the Dry Creek Warm Springs Valley Archeological District may be eligible for inclusion in the National Register of Historical Places,[2] and on May 9th, following twelve (12) days of hearings, the matter was submitted for decision.

It is estimated that the total Project will cost $114 million. The Corps claims that approximately $35 million has already been expended.

The complaint alleges jurisdiction under 5 U.S.C. § 702 (Review of Agency Action), 28 U.S.C. § 1331(a) (Federal Question), 28 U.S.C. § 1337 (Regulation of Interstate Commerce) and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment). It sets forth twelve (12) separate claims arising under a number of Federal Statutes and Regulations[3] but the attack is focused in two areas: (1) violations of National Environmental Policy Act § 102(2)(A) and (2) noncompliance with the National Registration of Historic Places Act (§ 16 U.S.C. § 470 et seq. and Executive Order 11593).

2. On April 2, 1974—eleven (11) days after the commencement of this litigation.

3. (a) The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970 Supplement) ;
   (b) Executive Order No. 11514 ;
   (c) The Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371 et seq. (1971 Supplement) ;
   (d) Council on Environmental Quality, Preparation of Environmental Impact Statements: Guidelines, 40 CFR § 1500, 38 Fed. Reg. 20550 et seq. August 1, 1973.
   (e) Water Resources Planning Act, Pub. Law 89–80 ;
   (f) Principles and Standards for Planning Water and Related Land Resources, Water Resources Council, 38 Fed.Reg. 24778–869, September 10, 1973 ;
   (g) Corps of Engineers Regulation No. ER 1105–2–507 and Appendices ;
   (h) The law applicable to judicial review of administrative actions, Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1970) ;
   (i) The Antiquities Act of 1906, 16 U.S.C. § 433 ;
   (j) Historic Sites Act of 1935, 16 U.S.C. §§ 461–467 as amended by the Act preserving historical and archeological data of 1960

The issues before the Court must be considered under 5 U.S.C. § 706(2)(D),[4] and are: (1) whether the Environmental Impact Statement conforms to the requirement of the National Environmental Policy Act and the regulations issued pursuant thereto, (2) whether the Corps has complied with the requirements of the National Historical Preservation Act and Executive Order 11593, (3) what remedy, if any, can be fashioned by the Court which would best effectuate the policies of the President and the Congress as such policies are set forth in the Executive Order and the statutes in question.

The EIS attack follows the standard pattern of many such challenges, namely that the discussion is not sufficiently detailed nor is it sufficiently descriptive of the environmental impact to be caused by the proposed Project. The complaint in this instance alleges seven (7) deficiencies:

1. Failure to discuss ecological impact that would result should the contemplated dam fail;

(the Reservoir Salvage Act) 16 U.S.C. §§ 469–469c ;
   (k) National Historic Preservation Act of 1966, 16 U.S.C. § 470–470n ;
   (l) Executive Order No. 11593 under the statutes listed in subsections (a) and (i)–(k) ;
   (m) Procedures for the Protection of Historic and Cultural Properties, 36 C.F.R. Part 800, 39 Fed.Reg. 3366–3370 (January 25, 1974) ;
   (n) Water Supply Act of 1958 as amended, 43 U.S.C. § 390b(b) ;

4. Although the complaint alleges that the decision to go forward with the Project was arbitrary, capricious and an abuse of discretion, and thus subject to judicial review (5 U.S.C. § 706(2)(A) ; Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S. Ct. 814, 28 L.Ed.2d 136 (1971) ), this was not seriously pressed at the hearing. Assuming arguendo that the court has the power to review the merits of the decision itself (Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971) ; Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1281 (9th Cir. 1973) the evidence presented fails to show conduct that would warrant judicial interference.

2. Insufficient discussion of the existence and amount of mercury that will be present in the reservoir water due to the flooding of a mercury mine, and in the fish due to a build-up of mercury in the food chain;

3. Adequacy of coverage on the various alternatives to the proposed Project;

4. Failure to adequately consider and discuss a geothermal resource loss which may result from the inundation of hot springs in the reservoir area;

5. Insufficient discussion of the downstream improvements and channelization which are contemplated by the Project;

6. Alleged defects in the computation of the benefit cost ratio and particularly in the use of $3\%_{10}\%$ interest rate; and

7. Failure to discuss the growth-inducement factor of the additional water supply which will be made available by the Project.

The question of whether an EIS complies with the mandates of NEPA has been extensively litigated. While the circuits do not agree on what purpose is to be served by an EIS, the Ninth Circuit holds that it is to inform the decision makers of the environmental ramifications of the proposed action, nothing more and nothing less. Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973). The EIS should provide a basis for evaluation of the benefits of the proposed Project in light of its environmental risks and draw a comparison of the net balance for the proposed action with the environmental risks presented by other alternative courses of action. Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); Life of the Land v. Brinegar, *supra.*

More specifically, an EIS must at a minimum contain such information as will alert the President, the Council on Environmental Quality, the public and the Congress to all known possible environmental consequences of an agency's action. Environmental Defense Fund v. Armstrong, 352 F.Supp. 50 (N.D.Cal.1972); affirmed at 487 F.2d 814 (9th Cir. 1973); cert. denied 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974). If the EIS meets these requirements NEPA has served its purpose by stimulating a full examination of all objections, adverse consequences and reasonable alternatives. It then becomes a question of project justification in light of this full environmental discussion. NEPA does not give courts the authority to approve or disapprove the construction of a properly authorized project accompanied by an adequate EIS. Lathan v. Volpe, *supra* at Fn4; Environmental Defense Fund v. Armstrong, *supra.*

To withstand a challenge, the EIS need not achieve scientific unanimity on the desirability of the Project. Disagreement among experts, standing alone, has never invalidated the adequacy of an EIS. To the contrary, courts have noted that "further studies, evaluation and analyses are almost certain to reveal inadequacies or deficiencies" of an EIS. Life of the Land v. Brinegar, *supra,* at 472–473.

Despite their strenuous efforts to the contrary, plaintiffs have not sustained their burden of showing how the EIS has failed to meet the above standard. Specifically:

*Seismicity*

Plaintiffs assert that the EIS is fatally defective because of its failure to discuss the environmental impact that would result from a rupture of the dam. Their experts disagree with the Corps' experts on several points, and particularly on the issue of whether there is sufficient documentation in the EIS to justify conclusory statements such as "comprehensive field and laboratory studies by the District, which were reviewed by internationally-recognized experts led to the conclusion that an earth embankment could be safely constructed at the site chosen." (Pg. 2) and "Failure or damage of the embankment due to seismic-induced load such as to permit uncontrolled flow through the embankment

will not occur. Therefore, these (sic—there?) are no potential impacts." (E—100). In support of this contention that the EIS fails to reveal a basis for such statements, plaintiffs question the sufficiency of the geological studies on seismicity, and particularly the statement, "the Dry Creek fault (under the dam's abutment) is geologically old and there is no historic record of activity; nor is there evidence that the fault has been active in recent geologic time." (E—100).

The Court rejects these claims on several grounds.

Initially, the EIS, the referenced materials and Design Memo No. 9 (Geology) carry extensive and detailed discussion as to the geological and seismic nature of the entire area as well as the dam site itself. The information[5] was sufficient, in the opinion of Corps experts, on which to draw the conclusion here under attack.[6] The fact that concurrence of plaintiffs' experts has not been achieved is neither fatal nor surprising. Secondly, since these questions were raised, and are discussed in the comments section it would seem that the decision makers had available to them the fact that there *was* a controversy

and that it had been resolved in favor of dam safety.[7]

Finally, it is doubted that NEPA requires a report of the calamity which would flow from the unlikely event of a Project failure. 42 U.S.C. § 4332(C) requires that each report contain a detailed statement on "(i) the environmental impact of the proposed action. (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented . . ." This the EIS attempts to do. The Corps does not propose to build a defective dam that will endanger Healdsburg, nor is it their position, that such an impact cannot be avoided. To the contrary, the experts seemed to agree that a safe dam could be built successfully on the site in question. It is possible that if the Corps were planning a hazardous project it could be attacked under 5 U.S.C. § 706(2)(A). As noted above,[8] the evidence does not support such an attack. Furthermore, to say that NEPA requires an Agency to discuss in detail the consequence that would flow from a Project failure, and make it thus subject to attack under 5 U.S.C. § 706(2)(D) would allow plaintiffs to maintain an otherwise dubious direct attack on the

---

5. The bulk of the testimony on the subject, much of which is also contained in the EIS, shows that a great deal of thought was given to seismic safety. For example, Design Memo No. 9 (Geology) shows extensive investigation of the area, including hundreds of borings and trenches. The Corps of Engineers also testified and Design Memo No. 15 shows that every reasonable seismic safety measure was designed into the dam. Finally, plaintiffs' experts did not testify that the dam was unsafe or that there was any likelihood that the dam would rupture. Their testimony was simply that defendants' experts did not in their opinion reveal sufficient data in the EIS upon which they could properly conclude that it *was* safe. The defendants' experts, and the Court, disagree.

6. For example: The complaint alleges:
   "vi. The shores of the proposed reservoir will be very steep. Landslides, a natural result of an earthquake will cause large waves. Those waves, exacerbated by wind during the stormy season when the

dam is full, could cause overtopping of the dam. Slides which could cause this result are to be expected in the slide-prone reservoir terrain." P. 19, L. 14.
   And further complains, "but no response was made to the very specific comments, [among others] outlined above which have been received by the Corps." P. 20, L 30.
   Landslides are, however discussed in great detail in the EIS proper (at Pgs. 65, 66, 86 and 111) and in response to comments there were 3 full pages of discussion, see Exhibit "A".
   The Design Memo—which experts although not laymen are required to consult has even more support data. Interestingly, the negative opinions of plaintiffs' experts were given without their having had the benefit of the work actually done by the Corps, which was properly recorded in the various design memos and duly referenced in the EIS.

7. See Fn5 *supra*.

8. See Fn4 *supra*.

merits of the Project itself under the flimsy guise of environmental impact.

### Mercury Problem

The complaint contends that the EIS failed "to adequately evaluate the present and future mercury pollution hazard represented by the presence beneath the proposed reservoir of mercury-bearing hot springs and a former mercury mine., (Pg. 21, L. 22) and ignored recommendations to conduct '"further fieldwork and monitoring—before building the dam." Plaintiffs also claim that the EIS omits "negative conclusions and warnings about necessary further study in the United States Geological Survey Report on Mercury Poisoning . . ."

Despite the above contentions the EIS candidly recognizes the fact of inundation of the mercury mine (Pg. 42) and the problem of the introduction of mercury into the food web (Pp. 107, 108, 109 and 110). Furthermore, the comments: (1) Will mercury become a water quality problem as a result of inundating the abandoned mine and flowing hot springs (E—56); (2) Have sufficient studies been made to answer all questions concerning mercury (E—57); (3) Will mercury accumulations in the food chain in the reservoir affect the fish hatchery operation? Will this be monitored? (E—81); (4) Will the mercury concentration in the fishery eliminate fishing as a recreational opportunity? (E—86), have each been answered in considerable detail?[9]

During the trial, new issues were raised as to non or inadequate disclosure of boron, fluoride and asbestos traces in the water. Tables prepared by the Corps and referenced in the EIS indicate that the dilution of the boron and fluoride would be so extensive that there would be no danger to potential consumers. The problem as to the asbestos is too speculative to warrant comment.

Plaintiffs complain that more advance research could be done to remove any doubts as to any possibility of danger. As in any professional field, it becomes a matter of expert judgment as to how much data needs be accumulated before a decision can be made. Some insist on more data than others, and no objective standard has been shown that establishes how much input is required to elevate a "hunch" to an "educated guess" or to a "scientifically-supported conclusion".

### Inundation of Geothermal Resources

The Geothermal resources of the area and the specific hot springs in question are discussed (Pg. 41) and the EIS points out (Pg. 117) that the inundation of the hot springs will make the geothermal resource "less accessible." Plaintiffs object to the statements (Pg. 117, E—100) that the resource does not have "a present or foreseeable economic potential" as being contrary to fact and claims that a pending application for geothermal exploration of the area presently held by the State, and not disclosed in the EIS, indicates that at least some economic potential does exist. The EIS, however, does acknowledge that the *potential* remains (E—101) and that "the area can still be explored and developed, if feasible" (E—100) through use of angled, slant or offset drilling from sites outside the reservoir water levels. Although plaintiffs' expert questions the slant drilling feasibility, it cannot be said that the EIS does not provide the decision makers with a discussion of this environmental impact nor that it fails to set forth the factual basis for the reasoning and conclusions therein contained.

### Benefit-Cost Analysis

Plaintiffs argue that the 3.5% discount rate employed in evaluating the benefit-cost ratio was improper in light of current economic realities. As indicated by Judge Renfrew of this Court in Environmental Defense Fund v. Armstrong, 352 F.Supp. 50, 57 (N.D.Cal. 1972); affirmed at 487 F.2d 814 (9th

---

9. The responses cover the equivalent of two plus pages.

Cir. 1973); cert. denied 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974), this argument fails for two reasons:

1. The 3.5% interest rate is that which Congress has authorized to be used in government contracts.[10]

2. The Ninth Circuit has found no requirement in NEPA that any such cost-benefit analysis be included in the EIS.

█ Calculation of the benefit-cost ratio is a vague and complex process subject to varying formulations and interpretations. Opinions may vary as to which factors are appropriate and how they are to be weighed. Thus the determination of benefits and costs is generally a legislative function not amenable to judicial review. Sierra Club v. Froelke, 486 F.2d 946 (7th Cir 1973).

*Inadequate Discussion of Alternatives*

Plaintiffs' main contention in this area is that the alternatives mentioned are not adequately treated, that the conclusions are not properly supported, that the opinions of the agency experts are subject to question and that certain obvious alternatives, such as the alternative of delaying the Project, were not discussed. The EIS contains 18 pages (117–135) which are devoted to discussing 14 logical alternatives.[11] The EIS discussion concludes as follows:

"c. *Conclusions*. Although many of the alternatives discussed have merit, as a single project, Warm Springs Dam and Lake Sonoma provide the optimum utilization of water resources in the Russian River Basin . . . by taking advantage of multiple purpose development, the Warm Springs Project is clearly superior to

any single alternative or combination of alternatives. . . .

Nearly all of the Alternatives discussed may be also considered supplements to the Warm Springs Project. As the project will not provide full protection to the Russian River Basin, some time in the future, local protection works or additional reservoirs may prove desirable. However, for the present, serious consideration should be given to flood plain zoning which will further reduce potential flood damages. Warm Springs will provide sufficient water supply in the service area to about the year 2000, at which time additional supplies will have to be furnished. However, existing supplies and the supplies from Warm Springs could be made sufficient further into the future by wise management, wastewater reclamation, and increasing the efficiency of use. Similarly, the project will only supply a small portion of the basin's recreation demands and many of the alternatives discussed require implementation in addition to Warm Springs."

█ Fertile imaginations can, of course, postulate countless alternatives which an agency has failed to consider.[12] And while this may be true in the instant case, it cannot be said that failure to discuss some of the alternatives conceived by plaintiffs or the extent and depth of the alternatives discussed are so deficient as to constitute a fatal defect in the EIS.

In addition to the foregoing, plaintiffs attack the adequacy of the EIS as it deals with downstream improvements or channelization, the growth-inducement impact of the new water supply,

10. See Public Law 93–251, approved March 7, 1974, by the United States Congress, 88 Stat. 12.

11. (1) Non action, (2) Smaller project at same site, (3) Knight's Valley (two smaller dams at another location—which would create a single reservoir), (4) Coyote Dam enlargement, (5) Other reservoir projects (30 in number), (6) Local flood protection works, (7) Laguna de Santa Rosa Diversion Work, (8) Flood plain management, (9) Water importation, (10) Wastewater reclamation, (11) Groundwater, (12) Efficiency of water use, (13) Restrict water use, (14) Recreational alternatives.

12. Alternatives under NEPA: Toward an Accommodation—Ecology Law Quarterly, Vol. 3, Fall 1973, Pg. 705.

and recreation potential. These points were not seriously pressed during the course of the hearing and a careful study of the EIS reveals a sufficiently detailed discussion of the environmental ramifications in these areas to comply with NEPA's requirements.

The archeological attack is founded on the allegation that the final treatment in the EIS of the impact of the Project on archeological and historical sites is insufficient. Specifically, plaintiffs allege that the Corps has not conducted a survey of the full impact area for archeological sites which may be present, that the EIS does not properly evaluate the impact on the sites already identified and that it fails to adequately discuss potential mitigation of the impact on such sites. (First Amended Complaint p. 23:2). Plaintiffs also claim that since the Secretary of the Interior has determined that these sites may qualify for inclusion in the National Register of Historical Places the Corps is required to suspend further construction until the Advisory Council on Historic Preservation has an opportunity to make informed comment on the Project.

The Project was, of course, commenced *prior* to the adoption of either NEPA or Executive Order 11593. At the time it was commenced and pursuant to the Reservoir Salvage Act, 16 U.S.C. §§ 469 and 469a (1960) the Corps notified the Secretary of Interior who was required by the act to:

". . . cause a survey to be made of the area proposed to be flooded to ascertain whether such area contains historical and archeological data (including relics and specimens) which should be preserved in the public interest . . . (1) that data has exceptional historical or archeological

significance, and should be collected and preserved in the public interest, (2) that such data exists in such area, and (3) that it is feasible to collect and preserve such data, he shall cause the necessary work to be performed in such area to collect and preserve such data. All such work shall be performed as ·expeditiously as possible."

Pursuant to this section, in 1964 the Department engaged Dr. Traganza, a prominent archeologist, who conducted the first (and to this date only) archeological survey of the area to be inundated. He identified a total of eleven (11) possible sites of ancient Pomo settlements and concluded that the project would not endanger anything of great archeological value. The Department reviewed these conclusions and by letter of June 11, 1964 tacitly concurred therein. (Defendants' Exhibit # 8).

As the prepLration of the EIS began, the Corps contacted various archeologists to update Dr. Traganza's report for inclusion as the archeological element. The archeologists were unanimous in their response that Dr. Traganza's report was inadequate and a much more complete and detailed investigation was required.[13]

Instead of following these recommendations the Corps merely related the general archeological history of the project area in its Final EIS, acknowledged that further investigation was required and indicated that it would:

(a) Perform a reexamination of all sites originally found by Dr. Traganza and one added site reported by the University of California by means of a magnometer and/or chemical analysis;

(b) Archeologically investigate the downstream portion of Dry Creek from

---

13. For example: In his Archeological Studies for Warm Springs Dam, Lake Sonoma Project (Defendants' Exhibit #11) prepared for the Corps and forwarded on August 28, 1973, Archeologist Thomas L. Jackson said: "the passing of nearly 10 years since the Traganza survey and the institution of new environmental legislation has left the information from his cursory analysis inadequate for the preparation of such an element in the impact statement . . ." (Page 3). Jackson went on to recommend an inexpensive ($500 to $1000) interim study to determine the feasibility of certain scientific subsurface testing, to be followed by a much more complete "Full Archeological Impact Evaluation" if the preliminary test deemed it appropriate.

the project boundary to its confluence with the Russian River;

(c) That all studies be coordinated with the local Indian population or their representative for this ethnohistorical research; and

(d) That archeological examinations be made of all utility lines and future road rights-of-way in the project area and that other future aerial changes be investigated as required.

These investigations will be conducted in accordance with the provisions of Corps of Engineers' regulation ER 1105–2–12, dated May 15, 1973, titled "Archeological Investigations and Salvage Activities," which conforms to the policies of the Antiquities Act of 1960, the approved legislation pertaining to responsibilities for archeological activities of federal agencies, and the Historic Sites Act of 1935, as amended in June 1960, authorizing the appropriated funds for that purpose.

Further in the report the EIS states:

"g. *Loss of Archeological Sites.* About 13 archeological sites will be inundated by Lake Sonoma. Eleven of these sites were reported in the Traganza study. One was recorded and is on file at the University of California Archeological Research Facility, Berkeley, and one site was recorded by Messrs. Stephen A. Dietz and John Rauschkold in August, 1973. Although the Traganza Study concluded that none of the sites were of sufficient archeological significance to require excavation and the conclusion may have been reached on the two added sites, subsequent comments have recommended that a further investigation be made of this area. The results of this study will be disseminated to all involved agencies and interested individuals. Should the findings vary significantly from those presented, a supplement will be prepared as part of the EIS. Prior to floodings, evaluation and disposition action will be concluded as a result of this more in-depth archeological study." (Final EIS at page 116).

\* \* \*

And additionally,

"1. *Potential Archeological Resources.* Archeological sites in the flooded area will be both lost and preserved; although, prior to inundation, an in-depth study of all sites will have been taken to preserve and/or record such findings and complete the necessary salvage action." (Final EIS at page 139).

In its responses to the two comments on the issue: "The archeological investigations are inadequate," the Corps continues to speak of *prospective* studies (E–108). For example: comment 2 asks, "With reference to the Dr. Traganza's Study,—why wasn't a further and more in-depth study made?" The rather lame response from the Corps was:

"At the time of the Traganza study, California archeologists, as pointed out recently, were operating in a situation which was not designed to provide information adequate for the preparation of an environmental impact statement. It was a situation that allowed for very brief, inexpensive surveys to reveal what were, at the time, considered significant archeological resources. While many archeologists began to realize the inadequacy of this approach during the 1960's, it was not until the late 1960's and the NEPA in 1969, that more adequate controls could be instituted. In the instance of this project, which was authorized in 1962, the Traganza study was considered as adequate coverage and the environmental statement was based upon its findings. The actual construction work so far accomplished on this project has not impinged upon any of the potential archeological sites identified in this 1964 study as verified by the recent preliminary reexamination. A further and more in-depth study is now contemplated." (E—108).

Volume II of the EIS also reveals the severe criticism directed at the archeological element of the Draft EIS. In his

letter of September 17, 1973 to Col. Lammie, Project Director, Webster Otis, Special Assistant to the Secretary of Interior stated:

"The draft statement fails to provide substantive information regarding project impact upon cultural resources. The statement does not allow assessment of these project aspects nor of alternatives described. It does not indicate consultation with the State Historic Preservation Officer nor include a copy of his comments.

The archeological information provided was drawn from an obsolete survey report inadequately evaluating archeological and historical values. The report does not specify what areas were surveyed nor how thoroughly they were examined. Evidently the survey was undertaken by three people for three days; nine man-days is insufficient time for thorough coverage of the Dry Creek-Warm Springs area. Areas of high archeological potential surrounding the reservoir pool are subject to direct impacts resulting from construction and should be surveyed. The final statement should evaluate historic archeological resources reported to exist in the area. Several ethnographic Pomo villages are situated along lower Dry Creek, among them the major settlement Cawaka, as well as a vital transportation route." (Pg. 13, Vol. 2 EIS)

And Garland Gordon, Acting Chief of the Department, Arizona Archeological Center complained (Pg. 15) (in his letter of August 2, 1973) "Because of the high archeological potential of this area and the cursory nature of the previous survey, we recommend that an intensive archeological survey be performed in the project area." He concluded his letter, however stating, "We regret that we do not have the funds on (sic—or?) the personnel to perform a survey for this project during the 1974 fiscal year."

A September 14, 1973 letter from the California Rural Legal Assistance, Healdsburg (Pg. 53) and a three-page criticism from the Warm Springs Dam Task Force (Pg. 134) are also included in the EIS. Finally, a review of the transcripts of the two public hearings held on the project indicated that the archeological problem was discussed at the Santa Rosa hearing of August 30, 1973.

There is no question, and the EIS clearly shows that there are at least 11 potential sites of Pomo settlements and that these sites will be inundated. It is also undisputed that there is no way of presently knowing whether other sites exist in the area to be impacted by the project. Furthermore, the record shows that a detail survey is planned by the Corps and can be completed prior to any inundation of the sites and that the only aspect of mitigation which will be foreclosed by inundation will be preservation.[14] The Corps has specifically committed itself to conducting complete and detailed archeological surveys of the entire project area, of working with the Advisory Council, the State Historic Preservation Officer, the National Parks Service and interested local citizens, and to carry out such preservation, salvage or other methods of mitigation as is deemed appropriate. Furthermore, the Corps has demonstrated that it can proceed with the project and avoid the disturbance of any known or suspected sites until a thorough evaluation and appropriate mitigation has been carried out. In addition, the testimony reveals that a one-year postponement, which delay pending such studies would entail, would cost the project $9 million while an award and subsequent termination of the contract (within 6–9 months) would cost an estimated $3 million.

■■■ Plaintiffs contend that if the Court finds the archeological element deficient, it must enjoin all further work until a supplemental EIS has been pre-

---

14. There are various methods of mitigation including: in-place preservation, salvage (e. g., excavation and removal), and sealing (rendering impervious to moisture).

pared and circulated and the decision to proceed has been re-evaluated.

The Court does not agree. Assuming arguendo that the archeological element is deficient, nothing in the NEPA, its legislative history or the cases indicates that the Court is to be thus limited in the use of its equity powers to fashion a remedy which will meet the needs of the particular case before it.[15] Furthermore, to take so rigid a position would be placing form over substance. While the decision to proceed with the present contract might make a subsequent abandonment of the project or a substantial modification thereof more difficult, it is certainly not foreclosed.[16]

In any event, the Court is not convinced that the EIS segment is deficient despite its obvious shortcomings. When measured against the above-described standard it seems obvious that the decision makers were fully aware that archeological sites were present, that many critics urged a thorough study before proceeding with the project and that the Corps intended to proceed without the study but to conduct it after the award of the contract here under attack. It cannot be said that the EIS has not ". . . stimulated a full examination of all objections, adverse consequences, alternatives. . . "[17]

Compliance with NEPA, however, does not necessarily constitute compliance with Executive Order 11593. Executive Order 11593, Section 2(a) required all Federal Agencies to locate and nominate to the Secretary of Interior, all sites which appear to qualify for listing on the National Register of Historic Places. It further requires that the Agency head (in this case, the Corps) shall refer any questionable sites to the Secretary of the Interior for his opinion

respecting their eligibility for listing (§ 2(b)).

The Corps contends that it complied with this order, and determined, based on the Traganza report, that there were no sites that appeared to qualify.

The action of the Secretary on April 1, 1974 however, has triggered the second requirement of § 2(b), namely, that after nomination of listings, the Agency must reconsider the project and, if it proposes to substantially alter the property in question, shall not act with respect thereto until the Advisory Council on Historical Preservation has an opportunity to comment.

The Court believes, and finds, that the Corps must now comply with the procedures set forth in § 2(b). The Court, however, does not agree with plaintiffs, that the Corps is prohibited from disturbing *any* portion of the archeological district so nominated, but is restricted only from disturbing known or suspected archeological sites within the district.

*Conclusion*

The Corps is not required to give the same weight to plaintiffs' concerns as plaintiffs do. Its essential responsibility is to actually consider them,[18] which it has done in the instant case. Obviously, the amount of consideration given to each point is in direct proportion to the Corps' belief as to its relevancy and import, and disagreement over the amount of attention given is the gravamen of many of plaintiffs' objections. Whether the decision maker is influenced by the facts, opinions, and arguments offered by plaintiffs or whether such facts, opinions and arguments cause the decision maker to call for further studies and investigations is not a matter over which this Court or any

15. Environmental Defense Fund, Inc. v. Armstrong, D.C.Cal., 352 F.Supp. 50 (1972); Sierra Club v. Hickel, 433 F.2d 249 (9th Cir. 1970).

16. Col. Lammie testified; for example, that if the dynamic analysis of the dam to be constructed showed any doubt that it could be safely constructed at the present site the project would be abandoned.

17. Environmental Defense Fund v. Armstrong, 487 F.2d 814 (9th Cir. 1973) at 822.

18. Hanly v. Mitchell, 460 F.2d 640 (2nd Cir. 1972).

court has control,[19] but a full reading of the EIS and 14 days of testimony clearly shows, at least to this writer, that the potential environmental impacts were thoroughly revealed and discussed and that the basis for the various conclusions reached in the EIS were reasonably (and sufficiently) documented. The main text of the EIS is in clear, concise, easily readable form so as to provide a reasonably intelligent non-professional an understanding of the environmental impact that will flow from the project. The referenced material, and particularly the design memos, afford the more sophisticated reader, a detailed technical statement of the basis for the various conclusions drawn.

The Court is satisfied that while the EIS may not be as fair and impartial or objective as if it had been compiled by a disinterested third party, it does meet the full-disclosure requirements of NEPA and is a record upon which a decision maker could arrive at an informed decision. As discussed above, however, conformity to the requirements of Executive Order 11593 is another matter, and the Corps is, therefore, by the Order attached hereto, directed to comply therewith.

This Memorandum of Decision constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## ORDER

It is hereby ordered that the plaintiffs' motion for preliminary injunction be, and hereby is, denied for the reasons more fully set out in the attached Memorandum;

It is further ordered that the defendants may not disturb the Takaton archeological site, as determined by the Banks-Miller Memorandum of May 8, 1974, until completion of the appropriate mitigative measures to be specified by the Advisory Council on Historic Preservation and the State Historic Preservation Officer.

It is further ordered that the Court retain jurisdiction and may, upon proper motion and hearing, extend the protection of this Order to other sites within the construction area that are subsequently determined to be potentially significant archeological sites.

## APPENDIX

### Exhibit A

XII. ISSUE: The Draft Environmental Impact Statement does not adequately discuss items geology and seismicity which include: Landslides, seismic effects, geothermal development, remedial measures, and geologic data for alternatives.

ISSUES RAISED BY:

Department of Agriculture, Forest Service
Department of Interior
Environmental Protection Agency
Citizens Environmental Advisory Committee, Russian River Basin
League of Women Voters, Santa Rosa
Public Hearing, Santa Rosa
Two Individuals

A. Summary Comments on Landslides

1. *Comment*:

Landslides should be studied, evaluated, and described further. Instrumentation programs should be described.
*Response*:

Landslides, both in the reservoir and damsite areas, were the subject of many detailed studies which were not included in the EIS for reasons of space and relative emphasis.

Slides in the damsite area were explored, sampled, and tested for evaluation of use as embankment materials and in order to decide which should be removed during construction.

Reservoir landslides were recognized early in the formulation of the project to be potentially troublesome. All were mapped, studied, and reported in detail in the Geology Design Memorandum.

19. Environmental Defense Fund v. Corps of Engineers, D.C., 342 F.Supp. 1211 (1972).

The conclusions regarding reservoir landslides expressed elsewhere in these comments were derived from these studies and the advice of experts from higher levels in the Corps along with opinions from various consultants in geology and soils engineering with considerable experience in similar situations.

Part of a continuing program of studying and reevaluating conclusions is a program of regular field examinations and installation of slope indicators to determine present movement rates. Four locations in two of the largest slides have been instrumented, surface movement (survey) points are planned to accompany them, and photo comparator studies will be initiated before reservoir filling.

2. *Comment*:

What would be the effects of earthquakes on slides after reservoir is filled? Does design of dam allow for possible effects?

*Response*:

Rapid movements of large amounts of material, even though saturated and subject to earthquake vibrations, are not likely. The profiles of the large, old (Pleistocene) slides show that most of the material involved is already at the bottom of the slope, and often will be below the reservoir surface. The relatively thin veneer of disturbed or weak material will not be excited into rapid sheet movements by earthquakes. What will happen is localized bank caving and steep slope slumping of minor amounts of saturated materials. There is sufficient freeboard on the dam to allow for all eventualities even though those eventualities may not occur.

3. *Comment:*

Landslides associated with road construction are not discussed.

*Response*:

Landslides associated with road construction as well as other construction activities are discussed in paragraph 3.-b.(17).

4. *Comment*:

Questions the time slides will most likely occur at various reservoir levels.

*Response*:

It is true that the time of year that slides are most active is in the late winter when the flood control pool might be in use. Rainfall saturates slopes and causes failures, rainfall causes runoff to fill the flood control pool. Movement of any slides large enough to do more than locally increase turbidity will be slow, however. Instruments have established rates of 0–1-inch per year. Operation of the reservoir (flood control pool) may increase this rate but it will still be slow. Ample freeboard above the flood control pool allows for any possible surface effects.

5. *Comment*:

Will earthquakes trigger existing landslides or cause new slides in saturated reservoir walls? How big could these slides be and how fast might they move? Have slides caused waves been considered in freeboard allowance along with earthquake effects?

*Response*:

Rapid movements of large amounts of material, even if saturated and subjected to earthquake vibrations, is extremely unlikely due to the relatively flat slopes and physical properties of the slide debris. The profiles of the large, old (Pleistocene) slides show that most of the available material is already at the bottom of the slope, and often will be below reservoir surface. The relatively thin veneer of slide materials on the upper slopes, if reactivated, will enter the reservoir gradually. Because of this and the shape of the reservoir, there is no possibility of slide (or earthquake) caused waves affecting the dam. The effects of seismicity combined with sliding were considered in the embankment design.

6. *Comment*:

How big could a wave induced by landsliding be? How would this affect

the dam if the water level was near or at maximum storage capacity?

*Response*:

Slides are not expected to occur at a rate that will induce waves. As stated in paragraph 2.d.(17), "Any failure should occur by gradual slumping." Thus, no significant waves are expected from landslides.

7. *Comment*:

Why has only 26,000 acre-feet of storage been allocated to sedimentation when 36,000 acre-feet are expected to enter the reservoir as a result of landsliding and suspended sediment measurements indicate a rate over one and one-half times that rate used to establish 26,000 acre-feet?