**CITIZENS AGAINST THE DESTRUCTION OF NAPA, an unincorporated association, et al., Plaintiffs,**

**v.**

**James T. LYNN, Secretary of the Department of Housing and Urban Development, individually and in his official capacity, et al., Defendants.**

**No. C-73-1553 WHO.**

United States District Court,
N. D. California.

Feb. 3, 1975.

Charles G. Reid, Adcock, Reid & Duree, Fairfield, Cal., for plaintiffs.

Benjamin D. James, Jr., James & McGriff, San Francisco, Cal., for Napa Community Redevelopment Agency.

W. Scott Snowden, Deputy City Atty., Napa, Cal., for City of Napa.

James L. Browning, Jr., U. S. Atty., Rodney H. Hamblin, Asst. U. S. Atty., San Francisco, Cal., for defendant James T. Lynn.

## MEMORANDUM OPINION AND ORDER

ORRICK, District Judge.

Plaintiffs, Citizens Against the Destruction of Napa, Lawrence Friedman and Arthur Stewart, Jr. (reference to "Citizens" throughout includes all plaintiffs), seek to enjoin the Department of Housing and Urban Development ("HUD") from funding a fourth "action year" of urban renewal in the City of Napa's Parkway Plaza Project ("the Project") under the Neighborhood Development Program ("NDP") of the Housing Act of 1949 and the Housing and Urban Development Act of 1968. Citizens also asks for injunctive relief

against defendants City of Napa and The Napa Community Redevelopment Agency ("NCRA") prohibiting them from proceeding with planning, razing and construction in connection with the Project. Declaratory relief against all defendants is also sought.

Jurisdiction is invoked under 28 U.S.C. § 1331(a) (federal question), 5 U.S.C. §§ 701–706 (review of administrative decisions), and 28 U.S.C. §§ 2201, 2202 (declaration of rights under the National Environmental Policy Act ("NEPA" or the "Act")).

The gravamen of Citizens' complaint is that the final Environmental Impact Statement ("EIS") filed by HUD fails to satisfy NEPA's rigid requirements. 42 U.S.C. § 4321 et seq. Specifically, plaintiffs allege that: (1) the scope of the EIS is too narrow; (2) it fails to discuss reasonable alternatives in good faith and in sufficient detail; and (3) it does not constitute a "detailed statement" of the potential environmental ramifications of the Project. The matter came on for hearing regarding the sought-after relief in this Court on October 10 and November 5, 1974. For the reasons hereinafter enumerated, the relief plaintiffs seek is denied, and the action is dismissed.

## I. THE PROJECT

The Project is a redevelopment plan for the deteriorating urban heart of the City of Napa. The proposed undertaking encompasses 33 city blocks (approximately 324 acres) and includes 5 separate and distinct sub-districts.[1] At this time only the plan for the central business district has come to any degree of fruition.

Consistent with the economic realities of modern urban redevelopment, Napa city officials envisioned that the Project would be financed primarily by grant and loan money from state and federal government sources. Accordingly, the City took several steps to secure such funds. In order to qualify for certain state financial benefits, NCRA was created to implement the Project by Napa City Ordinance pursuant to California Health and Safety Code Section 33000 et seq. The Project plan was approved by the Napa City Council by the adoption of another ordinance in December of 1969. The ordinance was subsequently amended by ordinances enacted in 1970 and 1973.[2] The adoption of the Project plan by the City Council was a prerequisite to eligibility for HUD funds. 42 U.S.C. § 1451.

Federal financing was forthcoming in the form of an NDP grant.[3] Such funding was authorized by the Housing and Urban Development Act of 1968 (82 Stat. 476), which amended the Housing Act of 1949. NDP financing consists of funding in annual increments. 42 U.S.C. § 1469(b). This type of urban redevelopment assistance is reevaluated by HUD annually; approval by the Secretary of HUD of funds for one action year does not obligate him to provide financing for another. 42 U.S.C. § 1469c(b).

NCRA has already received NDP grants and loans totalling approximately $6 million for three action years. The proposed contract for a fourth action year involves approximately $2.8 million in HUD funds. The three action years already funded by the NDP financed redevelopment in a nine-block area in the center of the traditional Napa shopping/business district. The nine-block area is rectangular in shape; renewal work in it is substantially com-

---

1. The sub-districts include: (1) central business district, (2) governmental and office district, (3) visitor's district, (4) central living district, and (5) open space and park district.

2. The 1973 amendment enlarged the proposed area of the central business district to 20 blocks.

3. Funds received from HUD by the local agency are generally applied toward the acquisition of land, the demolition and removal of improvements and buildings, and the installation of improvements. New building on redeveloped land is financed and supervised primarily by private parties.

plete at this time. The proposed fourth action year would add another three-block area to the nine-block area. The three-block area actually consists of two rectangular parcels, each contiguous to the nine-block area but not to one another. The challenged EIS discusses the ramifications of redevelopment of the three-block area. At present, the two parcels comprising the three-block area are primarily built over with small businesses, many of which are owned and operated by members of Citizens. Four families also reside there.

The plan adopted by the City Council in 1973 includes eight more blocks within the central business district. The proposed eight-block area is composed of four parcels, two of which are rectangular in shape and two of which are of irregular configuration. The parcels in the eight-block area are contiguous to those in the nine and three-block areas, but not to one another. The parcels in the eight-block area currently serve a variety of use functions; although some are commercial in character, most are residential.

Redevelopment of the eight-block area would presumably be funded, if at all, by the fifth and sixth action years, upon completion of work in the three-block area. This is now impossible due to new legislation. In August, 1974, President Ford signed into law the Housing and Community Development Act of 1974 (88 Stat. 633), which eliminates the Neighborhood Development Program. Thus, the fourth action year will be Napa's last. Under the 1974 Act, however, local agencies that have received certain aid in the past are assured of funds in the future under a grandfather clause. Funds allocated under the 1974 Act will be given to local redevelopment agencies with fewer strings attached than under prior law. Thus, while action year funds had to be used toward redevelopment activities, funds available under the 1974 Act may be applied toward mass transit and other non-construction uses. Moreover, if an environmental impact statement is required, it must be prepared by the local agency. 88 Stat. 640–641. Napa stands to receive a substantial amount of funding under the 1974 Act. Subcommittee on Housing of the House Committee on Banking and Currency, Directory of Recipients—Housing and Community Development Act of 1974, p. 31.

## II. THE LITIGATION

On August 30, 1973, Citizens, a group of approximately 30 Napa residents and business owners, filed this action seeking declaratory and injunctive relief in regard to the proffer of the fourth action year plan contract. Citizens objected to HUD's failure to prepare an EIS in light of the proposed project's unavoidable significant affect upon the quality of the human environment. 42 U.S.C. § 4332(2)(C). The matter was continued by stipulation, and HUD agreed to prepare an EIS.

A draft EIS was completed the following March, and copies were sent to all governmental agencies and interested parties for comment. After a number of changes were incorporated into the draft version, a final EIS was filed in August of 1974. It is this document which is challenged in this action. By stipulation and order filed August 22, 1974, HUD was permitted to sign the fourth action year contract and to commence providing funds to NCRA; but consistent with that order, no property acquisition, demolition, etc. has been undertaken to date.

## III. CONTENTIONS OF THE PARTIES

Citizens argues that the EIS should have discussed the potential environmental consequences of redevelopment of the eight-block area as well as of the three-block area, reasoning that federally-financed urban renewal of the eight blocks is inevitable. Plaintiffs also contend that the EIS is a shallow and superficial document designed to justify the federal action rather than to satisfy the goals of disclosure and education

which prompted the enactment of NEPA.

Defendants seek to justify the decision to limit the scope of the EIS to the three-block area by arguing that funds provided by the fourth action year NDP grant are limited to expenditures for redevelopment of that area, and that possible HUD funding of the eight-block area, if such funding becomes a reality, will be accompanied by its own EIS. Defendants deny that the EIS constitutes only *pro forma* compliance with the specificity and alternatives requirement of NEPA.

## IV. STANDARD OF REVIEW

■ Judicial review of this or any EIS is of a very limited scope. It is not the function of the Court to pass judgment on the wisdom of the federal action which prompted the preparation of the document; the Court is limited to ensuring that the relevant federal agency and the public are fully apprised of the possible environmental consequences of federal involvement in the project. Life of the Land v. Brinegar, 485 F.2d 460, 465–466 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L. Ed.2d 312; Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D. C. 5, 458 F.2d 827 (1972); Warm Springs Dam Task Force v. Gribble, 378 F.Supp. 240, 244 (N.D.Cal.1974).

NEPA is essentially a procedural statute, and the question of whether an EIS complies with its requirements is a procedural one governed by standards enunciated by decisions under 5 U.S.C. § 706(2)(D).[4] Trout Unlimited v. Morton, 509 F.2d 1276 (9th Cir., 1974); Lathan v. Brinegar, 506 F.2d 677 (9th Cir., 1974). These standards are elusive, however, since following the "procedure required by law" in relation to the sufficiency or scope of an EIS depends exclusively on the particular circumstances in each case. No procedural

rules by which the adequacy of an EIS shall be gauged have as yet been enacted by the Congress, promulgated by the Council on Environmental Quality or defined through case law. Trout Unlimited v. Morton, *supra*. And, as *Trout Unlimited* points out, existing case law is far from helpful because the adequacy of each EIS of necessity turns on its own facts. Thus, in this Circuit, district courts should determine whether:

" * * * the EIS serves substantially the two basic purposes for which it was designed. That is * * * [whether] its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information." *Id.* at 1283 of 509 F.2d.

## V. SCOPE OF THE EIS

■ None of the funds provided through the fourth action year will be expended on activities within the eight-block area. Nevertheless, Citizens contends that the EIS should have considered the effect urban redevelopment of the eight-block area would have on the environment. Plaintiffs rely on several theories, many of which stem from a line of cases arising from highway development (cf. discussion, *infra*).

### A. *Background*

As discussed *supra*, Napa will be receiving substantial amounts of federal financial assistance under the 1974 Act. Although the funds are not earmarked for any particular use, Citizens contends, and it is safe to assume, that at least a portion of those funds will be

---

4. Section 706(2)(D) provides:
"* * * [the reviewing court shall] hold unlawful and set aside agency action

* * * found to be without observance of procedure required by law."

used for urban redevelopment. Yet, contrary to plaintiffs' assertion, there is no guarantee that the funds will be used toward redevelopment of the eight-block area. Moreover, even if such funds are directed to the eight-block area, there is a total lack of evidence as to how redevelopment there would proceed. The EIS in several places does discuss the *need* for additional off-street parking within the central business district, but does not refer to specific plans for such facilities. Plaintiffs contend that NCRA envisions a major department store in the three-block area, thus compelling the construction of parking lots in some portions of the eight-block area, but the testimony at the November 5, 1974, hearing established only that the members of NCRA are unsure, if not divided, over the wisdom of seeking a third major department store for the central business district. Even if the planners were united behind seeking a third such store, no effort has been made to find one. This highlights a significant fact—plans for the eight-block area at present are little more than differing hopes of the various members of NCRA and the community. Before redevelopment does overtake the eight-block area, considerable planning will have to be undertaken.

The entire Project, as noted earlier, is the subject of an overall "plan". A plan had to be adopted by the City as a condition precedent to the receipt of HUD funds. 42 U.S.C. § 1451. Such plans must be followed to a certain degree, but they are far from blueprints of development. The plan requirement was Congress' method of insuring against *ad hoc,* helter-skelter urban redevelopment by communities in a blind rush to secure federal funds. It does not create an inflexible covenant between HUD and the local agency and should not be interpreted to compel them to ignore subsequent changes in the values and ideals of the community and its chosen planners. Similarly, it should not be used as a club to compel the drafting of an EIS from

year one of a project covering the entire scope of the plan.

### B. *HUD Cases*

No case arising under the housing acts or the NDP has grappled with a problem similar to the one at bar. San Francisco Tomorrow v. Romney, 472 F. 2d 1021 (9th Cir. 1973), and Jones v. District of Columbia Redevelopment Land Agcy., 162 U.S.App.D.C. 366, 499 F.2d 502 (1974), cited by defendants, do not consider the instant problem. Both courts assumed that a new EIS must be prepared for each action year (see, 472 F.2d at 1023, 499 F.2d at 511), but neither was called upon to decide whether the EIS prepared for a given year should examine all potential future federal action.

### C. *The Highway Cases*

Lower federal courts have been diligent in preventing the government from dividing federal highway projects into artificial segments in order to circumvent NEPA. See generally, Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973); Sierra Club v. Volpe, 351 F.Supp. 1002 (N.D.Cal.1972); Thompson v. Fugate, 347 F.Supp. 120 (E.D.Va.1972), aff'd. in part, 452 F.2d 57 (4th Cir. 1971). Language from several of the legion of highway cases may be taken out of context to compel the preparation of broad, all-inclusive impact statements for all government interference with the environment. However, the soundest approach to the highway cases in a non-highway context is to extract the common sense tests the courts in those cases employed. It is not to carry the language over whole cloth as plaintiffs suggest or to ignore the cases completely as defendants propose.

### 1. *Coercive Effect Test*

Several courts have looked to whether a federal or federalized highway segment would coerce the construction of an additional segment in order to determine

whether the scope of an EIS covering only the first segment is adequate. Sierra Club v. Volpe, *supra,* at 1008 of 351 F.Supp; Named Ind. Mem. of San Antonio Con. Soc. v. Texas Hy. Dept., 466 F.2d 1013 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L. Ed.2d 136; Indian Lookout Alliance v. Volpe, *supra.* Phrased another way, does the length of freeway selected for coverage in the EIS preclude any alternative to the construction of another, indentifiable segment? Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn.1972).

This type of effect is easy to visualize in a highway context. A highway segment must begin and conclude in some logical place, and, accordingly, when a proposed segment is slated to link civilization to nowhere, an EIS covering just that segment is too narrow in scope because that segment will have to be connected to a roadway leading to civilization (or some other logical destination) in the future.

Completion of the proposed projects in the proposed fourth action year here, however, will not coerce urban redevelopment in the eight-block area. With the addition of the three-block area, the central business district will be self-sufficient with the exception of inadequate parking facilities. The parking condition was created by a combination of factors: (1) the pre-redevelopment central business district lacked sufficient parking (one of the reasons urban renewal was initially considered); (2) the construction of businesses in the nine-block area created a need for additional parking beyond that filled by parking facilities constructed in the nine-block area or those proposed in the three-block area; and (3) predictions of population growth in Napa which lead to the conclusion that more parking is needed in order to effectively service businesses in the central business district. Thus,

while parking facilities may well have to be constructed within the eight-block area, their construction will not have been coerced by renewal of the three-block area.

### 2. *Nexus Test*

This approach scrutinizes whether a small project which is undeniably a portion of a much larger government undertaking has such a substantial local purpose that it can stand alone, without the larger project, and serve the community. Sierra Club v. Froehlke, 359 F. Supp. 1289 (S.D.Tex.1973).[5] An analogous approach has been denominated "independent justification" analysis. Citizens for Balanced Environ. & Transp., Inc. v. Volpe, 376 F.Supp. 806, 813 (D. Conn.1974) (round two of Committee to Stop Route 7 v. Volpe, *supra*); James River and Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority, 359 F.Supp. 611, 635 (E.D.Va.1973), aff'd 481 F.2d 1280 (4th Cir. 1973). The Ninth Circuit, in Trout Unlimited v. Morton, *supra,* seemed to employ an independence test, but did so only in passing.

This is an exceedingly difficult test to carry over to the instant facts. Sierra Club v. Froehlke, *supra,* for example, involved a multi-billion dollar dam-irrigation-power complex that required decades of planning. James River and Kanawha Canal Parks, Inc. v. Richmond Metropolitan Authority, *supra,* was concerned with the ramifications of a series of highway projects on the city of Richmond. *Trout Unlimited* dealt with the construction of the Lower Teton Division of the Teton Basin Project, a proposed dam and reservoir project. In each of these cases the portion of construction under scrutiny was of significant scope, while here, only three blocks of urban renewal are at issue. It is impossible for those three blocks, upon completion of redevelopment, to have an

---

5. Reversed sub nom., Sierra Club v. Callaway, 499 F.2d 982 (5th Cir. 1974). In reversing, however, the circuit court employed a test similar to that devised by the district court.

independent justification. They will, of necessity, be dependent upon surrounding parcels. The question, then, is whether the three blocks, combined with the nine-block area, will have an independent justification. The answer is a qualified yes. The answer is qualified because it is unclear from the evidence exactly what the twelve-block area will comprise upon addition of the three-block area. I believe that the twelve-block area will be independent, with the exception of parking. This problem, as discussed *supra,* was created prior to the fourth action year.

### D. *Conclusion Re Scope of the EIS*

While federal aid to Napa is likely to be forthcoming, at this point in time it is not known how the funds will be used, where they will be used, and, if they are used in the eight-block area, whether they will be used toward the ends Citizens suggests. The EIS discusses the need for more parking in the central business district and the possibility that parking might be placed in the remaining area of the Project. Beyond that, the authors of the EIS could not, at this time, predict what development, let alone federally-aided development, will transpire in the Project in the future.

### VI. ALTERNATIVES

■ A federal agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources". NEPA, 42 U.S.C. § 4332(2)(D). Such alternatives must be discussed in the EIS (42 U.S.C. § 4332(2)(C)·(iii)), and actually be considered to the fullest extent possible by the agency. Calvert Cliffs' Coord. Com. v. United States A. E. Com'n., 146 U.S. App.D.C. 33, 449 F.2d 1109, 1128 (1971). And while discussion of alternatives is subject to a "construction of reasonableness" (Life of the Land v. Brinegar, *supra,* 485 F.2d at 472), a *good faith* discussion is necessary to inform the decision makers and the public

of all possible options, and is not to be employed to justify a decision already reached. City of Boston v. Volpe, 464 F.2d 254, 257 (1st Cir. 1972); Keith v. Volpe, 352 F.Supp. 1324 (C.D.Cal.1972).

Citizens contends that HUD never, in fact, considered any alternative to a fourth action year and, accordingly, that the EIS is merely a justification of a *fait accompli.* Citizens also argues that the discussion of alternatives is inadequate because it fails to go beyond mere assertions and neglects to indicate a factual basis for those assertions. City of Boston v. Volpe, *supra,* at 257 of 464 F. 2d; Silva v. Lynn, 482 F.2d 1282, 1287 (1st Cir. 1973).

■ Over seven pages of the EIS is devoted to a discussion of alternatives to the proposed fourth action year. The possibilities of no renewal, and several types of reuse of the three-block area (residential, public and industrial) are raised and rejected. Of necessity, alternatives to the fourth action year are of a limited nature. The option of no redevelopment of the three-block parcel, while it was discussed, is hardly a feasible one in light of demands (such as parking) made upon that area by developments in the nine-block area. The various other types of reuse are discussed in adequate detail. The EIS need not propose complicated and extensive alternatives to the planned project; rather it should suggest reasonable alternatives for consideration by the federal decision maker and the public. The record here indicates that the Project has been the subject of considerable public interest and the EIS has served its function in that regard.

■ HUD and NCRA cannot, of course, be required to simply conjure up strawman alternatives and then knock them down. Warm Springs Dam Task Force v. Gribble, *supra,* 378 F.Supp. at 247.

■ The contention that HUD never, in fact, considered any alternatives to a fourth action year raises another brand of problem. As in the numerous cases

decided shortly after the enactment of NEPA which dealt with projects proposed or partially constructed prior to the statute's effective date (see, e. g., Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973); Greene County Planning Board v. Federal Power Com'n., 455 F.2d 412 (2d Cir. 1972), cert. denied, 409 U.S. 849, 93 S. Ct. 56, 34 L.Ed.2d 90), it is difficult here to decide whether a completed agency decision, interrupted by application of the Act, has been reevaluated in accordance with the spirit of the Act. While the EIS eventually filed unequivocally supports that earlier HUD decision, I find that Citizens has failed to demonstrate that alternatives were not considered in fact and in good faith. The EIS afforded HUD (as well as NCRA and the Napa community) ample opportunity to reevaluate the objectives of the Project as well as the means initially proposed to attain those objectives. This satisfies the goals of the Act. Trout Unlimited v. Morton, *supra;* Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971).

## VII. DETAILED STATEMENT

Plaintiffs' contention that the EIS does not constitute the "detailed statement" contemplated by NEPA is buttressed by a listing of twenty purported flaws in the document. In addition, Citizens produced an expert witness at the hearing on this matter. He elaborated upon several of the putative flaws.

I will not deal with the alleged inadequacies one by one, for the real complaint with the EIS is not with the coverage or the lack of essential considerations, but rather with the particular scientific analysis employed and, specifically, with the conclusions reached.

■ An EIS need not be the size of the Manhattan telephone book in order to comply with NEPA; it need only inform the decision makers and the public of the environmental risks and benefits of the proposed project. No EIS is expected to, or could achieve scientific unanimity on the desirability of the project. Life of the Land v. Brinegar, *supra,* 485 F.2d at 473. Thus, disagreement of experts, standing alone, will not serve to invalidate an EIS. Trout Unlimited v. Morton, *supra;* Warm Springs Dam Task Force v. Gribble, *supra,* 378 F.Supp. at 244. In *Warm Springs,* Judge Williams of this Court recognized that " * * * [f]urther studies evaluation and analyses [by experts] are almost certain to reveal inadequacies or deficiencies [in the EIS]". *Id.* See also, Environmental Defense Fund, Inc. v. Corps of Engineers, 342 F.Supp. 1211, 1217 (E.D. Ark.1972), aff'd. 470 F.2d 289 (8th Cir. 1972); Allison v. Froehlke, 470 F.2d 1123 (5th Cir. 1972).

Finally, Citizens argues that the EIS does not include a detailed statement of " * * * irreversible and irretrievable commitments of resources which would be involved, in the proposed action should it be implemented". NEPA, 42 U.S.C. § 4332(2)(C)(v). Specifically, Citizens points to the inevitable loss of the land, the cost of construction materials, and the irretrievable loss of time. Daly v. Volpe, 350 F.Supp. 252 (W.D.Wash. 1972). The absence of a one or two page discussion of the unavoidable loss of these resources cannot be deemed a reason for granting the sought-after relief. Such a discussion, while it would be helpful as a summary, would only be a synthesis of the obvious in this case. Urban renewal, by definition, is the razing of existing structures and fixtures and the reconstruction of others. The body of the EIS expressly details this unavoidable conclusion.

■ More serious is the allegation that the EIS does not provide such a statement for the potential loss of flora and fauna within the three-block area. But in support of the contention, Citizens cites only a letter from the State Department of Fish and Game (appended to the EIS) which predicts a "serious impact" upon wildlife. The experts are not in agreement on this possibility al-

though it is discussed in detail in the body of the EIS. Again, the lack of a summarizing page or paragraph compressing the adequate discussion from the body of the EIS, particularly where it is far from a certainty that an "irreversible" loss will occur, is not a sufficient reason for holding the EIS defective.

## . VIII. CONCLUSION

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the foregoing constitutes the Court's Findings of Fact and Conclusions of Law and, accordingly,

It is ordered that plaintiffs' motions for injunctive and for declaratory relief are denied, and the action be and it is hereby, dismissed, each of the parties to bear its own cost. Defendant HUD shall prepare a final judgment, approved as to form by plaintiffs, by February 7, 1975.